# EXHIBIT A

# STATE COURT COMPLAINT

Electronically FILED by Superior Court of California, County of Los Angeles on 12/08/2021 10:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by K. Valenzuela,Deputy Clerk
21STCV44738

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Amy Hogue

1   Lisa S. Kantor, State Bar No. 110678
      *lkantor@kantorlaw.net*
2   Timothy J. Rozelle, State Bar No. 298332
      *trozelle@kantorlaw.net*
3   KANTOR & KANTOR, LLP
     19839 Nordhoff Street, Northridge, CA 91324
4   Tel: (818) 886-2525; Fax: (818) 350-6272

5   *Attorneys for Plaintiffs*
     Dual Diagnosis Treatment Center, Inc., Satya
6   Health of California, Inc., Adeona Healthcare, Inc.,
     Sovereign Health of Phoenix, Inc., and Medical
7   Concierge, Inc.

8

9                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                        **FOR THE COUNTY OF LOS ANGELES**

11   DUAL DIAGNOSIS TREATMENT              Case No.: 21STCV44738
      CENTER, INC., a California corporation,
12   d/b/a Sovereign Health of California;
      SHREYA HEALTH of CALIFORNIA
13   INC; MEDICAL CONCIERGE, INC. d/b/a
      Medlink; SATYA HEALTH OF
14   CALIFORNIA, INC.; SOVEREIGN            **COMPLAINT**
      HEALTH OF PHOENIX, INC.; SHREYA
15   HEALTH OF ARIZONA, INC.; ADEONA
      HEALTHCARE, INC.; VEDANTA
16   LABORATORIES, INC.,                    **DEMAND FOR JURY TRIAL**

17                        Plaintiff,

18            vs.

19   CALIFORNIA PHYSICIANS'
      SERVICES, INC., d.b.a. BLUE SHIELD
20   OF CALIFORNIA, a California
      Corporation; BLUE SHIELD OF
21   CALIFORNIA LIFE & HEALTH
      INSURANCE COMPANY, a California
22   Corporation; and DOES 1 through 25,
      inclusive; CHILDREN'S PRIMARY
23   DENTAL GROUP HEALTH BENEFIT
      PLAN; LIVING FITNESS HEALTH
24   BENEFIT PLAN; V. PAUL KATER, M.D.
      HEALTH BENEFIT PLAN; TRINET
25   EMPLOYEE BENEFIT INSURANCE
      PLAN,
26
                         Defendants.
27

28

*(Left margin vertical text:)* KANTOR & KANTOR LLP, 19839 Nordhoff Street, Northridge, California 91324, (818) 886 2525

1       Plaintiffs Dual Diagnosis Treatment Center, Inc. d/b/a Sovereign Health of California

2 ("Dual Diagnosis"); Shreya Health of California, Inc. ("Shreya"); Medical Concierge, Inc. d/b/a

3 Medlink ("Medlink"); Satya Health of California, Inc. ("Satya"); Sovereign Health of Phoenix,

4 Inc.; Shreya Health of Arizona, Inc.; Adeona Healthcare, Inc. ("Adeona") and Vedanta

5 Laboratories, Inc. ("Vedanta") (collectively referred to as the "Plaintiffs" or "Sovereign") files this

6 complaint against Defendant California Physicians' Services, Inc., doing business as Blue Shield

7 of California, Blue Shield of California Life & Health Insurance Company, and DOES 1 through

8 25, inclusive, (collectively, "Defendants" or "Blue Shield Defendants") as follows:

9

10                             **INTRODUCTION**

11      1.      Defendants are California corporations that issue health insurance policies, health

12 care service plan contracts, and administer ERISA plans throughout the State of California, and

13 are authorized to and are conducting business in all counties in the State of California, including

14 the County of Los Angeles.

15      2.      The true names and capacities, whether individual, corporate, associate, or

16 otherwise, of Defendants sued herein as DOES 1 to 25, inclusive, are currently unknown to

17 plaintiff, who therefore sues Defendants by such fictitious names under Code of Civil Procedure

18 §474. Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants

19 designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to

20 herein. Plaintiffs will amend this Complaint to reflect the true names and capacities of the

21 Defendants designated hereinafter as DOES when such identities become known.

22      3.      The several plaintiffs in this action treat individuals suffering from drug addiction

23 and/or mental health problems. As a matter of practice, Plaintiffs obtain assignments from their

24 patients.

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   4.  Plaintiffs bring this suit to enforce their valid assignments of benefits and to

2 enforce their contractual rights against Defendants under both state law and under the Employee

3 Retirement Income Security Act of 1974 ("ERISA").[1]

4   5.  In a nutshell, the Blue Shield Defendants did everything they could to undermine

5 Plaintiffs' ability to operate as independent, out-of-network ("OON") providers. Specifically, Blue

6 Shield engaged in the following improper conduct, all of which is prohibited by California state

7 law and ERISA:

8   a)  mislead Plaintiffs about whether claims are assignable under the governing

9 insurance policies or plan documents, and then later, with no explanation, refused to pay Plaintiffs

10 and instead paid some unknown amount to the recovering patient-addicts themselves,

11   b)  refused to honor assignments even when the underlying insurance policies or plan

12 document permitted them, and

13   c)  never plainly told its members or beneficiaries that the assignments they choose to

14 give would not be honored.

15   6.  This scheme of deception and confusion leaves OON providers like the Plaintiffs

16 misled, confused, and often holding the bag for services rendered in good faith to suffering

17 patients—all of which unfairly increased the cost of running their businesses.

18   7.  Defendants do not even attempt to hide this conduct. "Payments for services

19 rendered by providers who do not contract with [insurance companies like Blue Shield of Blue

20 Cross entities] are sent directly to our customers. Thus, out-of-network providers face the

21 inconvenience of attempting to collect payment from the customer and the accompanying

22 possibility of incurring bad debts." See Blue Perspective: BCBSOK Position on Legislation and

23 Regulatory Issues, Blue Shield Blue Shield Oklahoma,

24 www.bcbsok.com/grassroots/pdf/blueperspective_aob27-103003.pdf (last visited October 27,

25 2020).

26

27 [1] The majority of the claims in this action are based on California state law; however, plaintiffs will

28 be requesting that this Court exercise concurrent jurisdiction over the plaintiffs several ERISA claims.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    8.     Cutting providers out of the process also saves Defendants money by leaving to

2    unsophisticated patients (i.e., recovering addicts) the responsibility of ensuring that the insurance

3    plans have fully paid the patients' benefit entitlements.

4

5                              **JURISDICTION AND VENUE**

6    9.     Jurisdiction is proper under Section 410.1 of the California Code of Civil Procedure

7    and Article 4 of the California Constitution.

8    10.    Venue is proper under Section 395.5 of the California Code of Civil Procedure

9    because the principal place of business of the defendants (or some of them) is located in the

10   County of Los Angeles.  Further, much of the conduct that is the subject of this lawsuit occurred

11   within this County, including the providing of insurance coverage under the covered plans, and the

12   Defendant conducts business within this County, either directly or through wholly owned and

13   controlled subsidiaries.

14                              **PARTIES TO THIS ACTION**

15   **A.    PLAINTIFFS**

16   11.    Plaintiffs are entities that provided in- and out-patient substance abuse and/or

17   mental health treatment in California, Arizona, and other locations.

18   12.    Dual Diagnosis Treatment Center, Inc. d/b/a Sovereign Health of California ("Dual

19   Diagnosis") is a corporation duly organized and existing under the laws of California. At all

20   relevant times, Dual Diagnosis did business as "Sovereign Health of California," and on occasion

21   under other names in accordance with its governing certifications and licensures. At all relevant

22   times, Dual Diagnosis was certified to operate and maintain behavioral health treatment facilities

23   in San Clemente, Culver City and Palm Springs California, among other locations.

24   13.    Medical Concierge, Inc. ("Medlink") is a corporation duly organized and existing

25   under the laws of California, doing business as "Medlink." Medlink is licensed to operate and

26   maintain an adult residential facility ("ARF") for ambulatory mentally ill adults.

27   14.    Satya Health of California, Inc. ("Satya") is a corporation duly organized and

28   existing under the laws of California. At all relevant times, Satya did business as "Sovereign by

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

4
COMPLAINT

the Sea II," and on occasion under other names in accordance with its governing certifications and licensures. At all relevant times, Satya was licensed to operate and maintain behavioral health treatment facilities in San Clemente, Culver City, and Palm Springs, California, among other locations.

15. Shreya Health of California, Inc. ("Shreya") is a corporation duly organized and existing under the laws of California. At all relevant times, Shreya operated as a facility that provided 24 hour therapeutically planned living and rehabilitative environment for treatment of individuals with behavioral and other disorders. Shreya operated a treatment facility in San Clemente, California, among other locations.

16. Sovereign Health of Phoenix, Inc. is a corporation duly organized and existing under the laws of Delaware, doing business as "Sovereign Health of Phoenix." At all relevant times, Sovereign Phoenix is licensed to operate and maintain a behavioral health residential facility in Chandler, Arizona.

17. Shreya Health of Arizona, Inc. ("Shreya AZ") is an Arizona corporation. Its principal place of business is in Chandler, Arizona and Shreya AZ specializes in clinic/center care for rehabilitation and treating patients with substance abuse disorders.

18. Vedanta Laboratories, Inc. ("Vedanta") is a corporation that was duly organized under the laws of the Delaware. At all relevant times, Vedanta provides toxicology testing and quality assurance programs. Vedanta serves clinicians and healthcare facilities.

**B.    FORMER PATIENTS**

19. This lawsuit involves behavioral health treatment services rendered by Plaintiffs to many individuals ("Former Patients") who Plaintiffs are informed and believe, at all relevant times, possessed health insurance covering some or all of the services that Plaintiffs provided.

20. To protect their personal health information, the Former Patients are identified by their initials in **Exhibit A** to this complaint. The Former Patients who had health insurance

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

5

COMPLAINT

1  provided by either the California health insurance marketplace and/or employer-sponsored plans

2  covered by ERISA are listed on **Exhibit A** to this complaint, incorporated herein by reference.[2]

3  ### C.   DEFENDANTS

4      21.     Plaintiffs are informed and believe, and thereon allege, that Defendant California

5  Physicians' Services, Inc., d.b.a. Blue Shield of California ("Blue Shield"), is, and at all relevant

6  times was, a California corporation qualified to do business in the State of California, with its

7  principal place of business in San Francisco, California. Blue Shield of California is an

8  independent member of the Blue Shield Association, and is a health care service plan pursuant to

9  the Knox-Keene Act, California Health & Safety Code Section 1340 *et seq*.

10     22.     Plaintiffs are informed and believe, and thereon allege, that Defendant Blue Shield

11  of California Life & Health Insurance Company ("Blue Shield L&H") is, and at all relevant times

12  was, a California corporation qualified to do business in the State of California, with its principal

13  place of business in San Francisco, California. Defendant is a health insurance company licensed

14  by the California Department of Insurance.

15     23.     The true names and capacities of the Defendants named herein as Does 1 through

16  25, inclusive, whether individual, corporate, associate, or otherwise, are currently unknown to

17  Plaintiffs, and therefore Plaintiffs allege that each of these fictitiously named Defendants is

18  responsible in some manner for the events sued upon. Plaintiffs will seek leave of this Court to

19  amend the Complaint to assert the true identities and capacities of the Defendants named herein as

20  Does 1 through 25, inclusive, when such identities and capacities have been ascertained.

21     24.     Plaintiffs are informed and believe, and thereon allege, that each and every

22  Defendant, named or "doe'd in," was acting as the agent, employee or delegee of each other

23  defendant, and in doing the things alleged in this action, was acting within the scope of that

24  agency, employment or delegation, and with the permission and consent of each of the other

25  Defendants.

26

27

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

---

[2] Defendant will be provided specific information as to each Former Patient, so that it can identify

28  the patient and appropriate provide the administrative record in this action.

25.     Based upon documents obtained by Plaintiffs to date, Plaintiffs are informed and believe that the health insurance of each of the Former Patients referenced in the attached **Exhibit A** was obtained either through the California health insurance marketplace or was obtained through what ERISA defines as an "employee benefit plan." 29 U.S.C. § 1002(3).

26.     Based upon documents obtained by Plaintiffs to date, Plaintiffs are informed and believe that the health insurance coverage of Former Patients Da. Pa., Go. Du., Pe. En., and Qu. Be. was obtained through what ERISA defines as an "employee benefit plan." 29 U.S.C. § 1002(3). Specifically, Plaintiffs are informed and believe that the health insurance of these four Former Patients was obtained through what ERISA defines as a "welfare plan." 29 U.S.C. § 1002(1). Section 502(d)(1) of ERISA, 29 U.S.C. § 1132(d)(1), provides that "[a]n employee benefit plan [such as a welfare plan] may sue or be sued under this subchapter as an entity. . ."

27.     Upon information and belief Plaintiffs name the following welfare plans as defendants in this lawsuit:

28.     Children's Primary Dental Group Health Benefit Plan (the "Children's Dental Plan"). Plaintiffs are informed and believe that Defendant Children's Dental Plan is an employer-sponsored welfare plan capable of suing and being sued pursuant to section 502(d) of ERISA, 29 U.S.C. § 1132(d). The principal place of business of the Children's Dental Plan is 555 S. Rancho Santa Fe Rd., Suite 101, San Marcos, CA 92078.

29.     Living Fitness Health Benefit Plan ("Living Fitness Plan"). Plaintiffs are informed and believe that Defendant Living Fitness Plan is an employer-sponsored welfare plan capable of suing and being sued pursuant to section Living Fitness Dental Plan is 21139 Newport Coast Dr., Newport Coast, CA 92657.

30.     V. Paul Kater, M.D. Health Benefit Plan ("Kater Plan"). Plaintiffs are informed and believe that Defendant Kater Plan is an employer-sponsored welfare plan capable of suing and being sued pursuant to section Kater Plan is 6719 Alvarado Rd. #305, San Diego, CA 92120.

31.     TriNet Employee Benefit Insurance Plan (the "TriNet Plan"). Plaintiffs are informed and believe that Defendant TriNet Plan is an employer-sponsored welfare plan capable of suing and being sued pursuant to section 502(d) of ERISA, 29 U.S.C. § 1132(d). The principal

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

7

1   place of business of the TriNet Plan is 1100 San Leandro Blvd., Suite 300, San Leandro,

2   California 94577.

3       32.    The welfare plans listed above are collectively referred to hereafter as the "Welfare

4   Plan Defendants."

### ADDITIONAL FACTUAL BACKGROUND

**A.**    **Plaintiffs Provide Gold Standard Treatment Services**

8       33.    Plaintiffs are leading providers of comprehensive addiction and mental health

9   treatment programs and other services to individuals in various locations across the United States.

10       34.    It is widely accepted that the services rendered by Plaintiffs and similar providers

11   are extremely important. For example, according to the National Institute on Drug Abuse, every

12   $1 spent on substance abuse treatment saves $4.87 in health care costs and $7.00 in crime costs.

13   See Nat'l Inst. on Drug Abuse, Principles of Drug Addiction Treatment: A Research-Based Guide

14   (3d ed. 1999).

15       35.    Plaintiffs' approach to addiction and other mental health treatment was consistent

16   with best practices in the industry. Plaintiffs' proven track record also earned Plaintiffs accolades

17   from trade and government groups. Dual Diagnosis, for example, received the Gold Seal of

18   Approval from the Joint Commission, an independent not-for-profit organization that is the

19   nation's oldest and largest standards-setting and accrediting body in health care. And the

20   California Board of Behavioral Health Sciences, the California Association for Alcohol/Drug

21   Educators, and the National Association for Alcoholism and Drug Abuse Counsels approved

22   Plaintiffs' entities to provide continuing education to licensed professionals.

23       36.    Medlink, a fully furnished and licensed adult residential facility ("ARF"), contracts

24   for Plaintiffs to provide extensive non-medical and administrative services to Medlink and its

25   patients. By partnering with Plaintiffs, Medlink is able to deliver high-quality services to

26   individuals whose illnesses necessitate admission into an ARF.

27

28

KANTOR & KANTOR LLP
19839 Northoff Street
Northridge, California 91324
(818) 886 2525

B.    **Plaintiffs Are Out-of-Network Providers**

37.    Health care providers are either "in-network" or "out-of-network" with respect to insurance carriers. "In-network" providers are those who contract with health insurers to accept payments in full at rates discounted from their usual and customary charges for covered services in exchange for such insurers steering patients to their facilities and thereby increasing the providers' volume. "Out-of-network" providers are those that do not have contracts with insurance carriers to accept discounted rates from their usual and customary charges. Sovereign was an out-of-network provider.

38.    Under the applicable Blue Shield plans and policies, Blue Shield was required to pay promptly benefits for out-of-network services to Sovereign based on rates provided in the plans or policies. Depending on the specific Blue Shield plan or policy, those rates include:

- Some version of the reasonable and customary rate.
- A percentage of Medicare rates, which varies by plan.
- Other rate(s) as otherwise defined in the applicable plans.

39.    Often times, Blue Shield's plans and policies require it to reimburse out-of-network providers at the "lower of: (a) the provider's billed charge, or (b) the amount determined by Blue Shield to be the reasonable and customary value for the services rendered by a Non- Participating Provider based on statistical information that is updated at least annually and considers many factors including, but not limited to, the provider's training and experience, and the geographic area where the services are rendered."

40.    The Blue Shield Defendants charged their insureds higher premiums for the inclusion of "out-of-network" benefits in their respective plans and policies. Insureds may choose an out-of-network provider for a variety of reasons, such as the quality of care and amenities available at a particular facility or access to a specific doctor, as is the patient-beneficiary's choice under the Blue Shield plans or policies. Despite the foregoing, and despite Plaintiffs' out-of-network status, the Blue Shield Defendants' insureds frequently sought treatment at Sovereign.

**C.      Plaintiffs Obtain Valid Benefit Assignments from Each Former Patient**

41.      Upon registration at Sovereign, all patients, including Blue Shield Defendants'
insureds, executed an assignment of claims/benefits form, among other documents. In the
Assignment, Blue Shield Defendants' insureds irrevocably and fully assigned to Sovereign their
rights to benefits, claims, and causes of action under the Blue Shield Defendants' plans and
policies.

42.      Here, the broad language of the assignments clearly manifests an intent by the
Former Patients to assign all their rights arising from the insurance contract related to the
treatment provided by Sovereign. The Assignments provide in pertinent part:

I, Policyholder, irrevocably assign, transfer and convey to Provider the *exclusive rights to
my benefits, insurance proceeds or other monies otherwise due to me for services rendered by
Provider ("Benefits") from my insurer*, employee benefit plan, welfare benefit plan, government
plan, tortfeasor or other liable third party ("Liable Third Parties"), and *all administrative, arbitral,
judicial or other rights* I may have relating to the recovery of Benefits from Liable Third Parties,
including but not limited to, my rights to: 3. *Obtain legal and equitable remedies, including,
without limitation, damages, penalties, . . . .* and 7. *[r]ecover attorneys' fees and court costs . . .*
incurred in connection with any proceeding relating to the enforcement or defense of the rights
assigned."

43.      As a result of this assignment, Plaintiffs had the same rights the Former Patients
had under applicable insurance contracts or health plans.

44.      Plaintiffs (or their agents, on Plaintiffs' behalf) obtained a valid assignment of
benefits ("Assignment") from all patients before treating them.

45.      The Assignments give Plaintiffs the right to be paid directly for any services
rendered to patients, and also entitle Plaintiffs to assert patients' legal rights to recover benefits.
These legal rights include the right to file claims and appeals, to request and obtain information
and documents relating to the plan, and to bring suit.

46.      The Assignments entitle Plaintiffs to collect payment for services provided to the
Former Patients directly from the Blue Shield Defendants.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

47.     The Assignments also confer legal standing on Plaintiffs to assert various legal claims against the Plans and the Blue Shield Defendants, including the claims in this Complaint.

48.     Upon information and belief, most of the Blue Shield Defendants did not prohibit their insureds from assigning their rights to benefits under the Blue Shield plans or policies, including the right of direct payment of benefits under the plans or policies to Sovereign.

49.     Moreover, to the extent that any of the Blue Shield Defendants prohibited the assignment of benefits to Sovereign, Defendants have waived any purported anti-assignment provisions, have ratified the assignment of benefits to Sovereign, and/or are estopped from using any purported anti-assignment provisions against Sovereign due to their course of dealing with and statements to Sovereign as an out-of-network provider. Through the verification process and claim submission (which included a written disclosure of an assignment) the Blue Shield Defendants were aware that their insureds had executed valid assignments in favor of Sovereign and the Blue Shield Defendants have not raised any anti-assignment concerns.

**D.     Plaintiffs Verify Patients' Insurance Coverage**

50.     In addition to receipt of the Assignment, before admitting a patient, Sovereign would contact Defendants by telephone to verify the patient's benefits: that he/she had insurance, that the insurance plan or policy at issue provided for out-of-network benefits, whether there were limitations or exclusions applicable, and what the patient deductible, out-of-pocket maximum, and coinsurance were. Sovereign would also ask how the Blue Shield Defendants covering the insureds at issue determined the out-of-network benefits for the procedure(s) at issue.

51.     Plaintiffs, who during all relevant times were for-profit enterprises, allow prospective patients to pay for their services out-of-pocket or with health insurance. Unfortunately, many individuals in need of treatment cannot afford to pay for Plaintiffs' services up front. Plaintiffs are only able to treat those individuals who have health insurance covering some or all of their services.

52.     Before agreeing to treat any patient, Plaintiffs take steps to ensure that they will be compensated for their services. When a prospective patient seeks to pay with his or her health

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

insurance, Plaintiffs investigate whether and to what extent the patient's insurance policy covers their various levels of service.

53.    When each Former Patient first sought treatment, as a matter of intended general practice described below, Plaintiffs or their agents verified that he or she was insured and ascertained the scope of his or her coverage through various procedures.

54.    Plaintiffs or its agents first secured the Former Patient's consent to contact his or her health insurance company, along with the identifying information necessary for Plaintiffs to interact with the insurer.

55.    Plaintiffs or their agents also asked for the dedicated phone number of healthcare providers associated with the Former Patient's insurance policy ("Provider Hotline").

56.    Plaintiffs are informed and believe that each Former Patient authorized Plaintiffs to contact the Provider Hotline of a Blue Shield Defendant. Plaintiffs or their agents generally recorded this information in the top box of a comprehensive document entitled "Insurance Verification Form."

57.    Plaintiffs or their agents called the Provider Hotline listed on the Insurance Verification Form on each Former Patient's behalf. When it reached a Blue Shield Defendant, Plaintiffs or their agents relayed the Former Patient's identifying information and requested details about his or her coverage. Plaintiffs or their agents generally, but not always, recorded the information learned from the Blue Shield Defendant on the bottom of the Insurance Verification Form.

58.    To attempt to complete Plaintiffs' Insurance Verification Form, Plaintiffs or their agents generally inquired exhaustively into the characteristics of the Former Patient's health insurance coverage, including with respect to:

a)    The general characteristics of the health insurance policy (including fields for effective date and renewal date, the type of plan, and whether it covers preexisting conditions, among other things);

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

b)      The existence and scope of any substance abuse or mental health coverage (including fields regarding deductible for in-network and out-of- network services and maximum out-of-pocket payments for in-network and out- of-network services, among other things);

c)      Any precertification requirements (including fields indicating whether precertification required for inpatient treatment, residential treatment, partial hospitalization, intensive outpatient treatment, and/or outpatient treatment by in-network and out-of-network providers); and

d)      Copayments for each type of treatment and any limits on the length of treatment.

59.      Plaintiffs or their agents generally also investigated the logistics of securing authorization and payment for Plaintiffs' services, including:

a)      How to comply with precertification requirements (including fields for pre-certification company and telephone number);

b)      The name of the insurance company and the entity to which benefit claims should be submitted (including fields for insurance company and claims address); and

c)      Whether the Former Patient's health insurance benefits were assignable. The answer to this question was supposed to be recorded by circling "Yes" or "No" (or "Y" or "N") next to the word "assignable" on the Insurance Verification Form.

60.      After the insurance verification process, Plaintiffs then contacted each Former Patient to discuss his or her insurance policy and to make appropriate arrangements for treatment.

**E.      Each Former Patient Had "Preferred Provider Organization" Coverage for Substance Abuse and Mental Health Treatment Services**

61.      Plaintiffs only wished to provide services that prospective patients could afford. As such, as a matter of course, Plaintiffs investigated whether the treatment needed by a patient (including the Former Patients) was covered by insurance.

62.      When Plaintiffs or their agents called the Blue Shield Defendants' Provider Hotlines, they learned that each Former Patient's health insurance policy had at least the following key features: (1) coverage for substance abuse/mental health treatment offered by Plaintiffs, and (2) preferred provider organization ("PPO") coverage.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

63.     A PPO plan covers medical expenses incurred when the insured visits either an "in-network" provider (i.e., a provider who has a contractual relationship with the insurance company) or an "out-of-network" provider (i.e., one who does not have a contractual relationship with the insurance company).

64.     PPO coverage tends to be significantly more expensive than health maintenance organization ("HMO") coverage because it gives insureds the option to visit the providers of their choice. Many insureds are nevertheless willing to pay a premium for PPO coverage to gain access to a bigger and better pool of providers.

65.     No law required the plans to offer PPO coverage instead of HMO coverage. Each Plan chose to offer the more robust and expensive insurance to their employees, and each Former Patient or subscriber enrolled in and paid for that premium level of coverage.

66.     Plaintiffs are out-of-network with respect to all Blue Shield Defendants. In other words, Plaintiffs are not contracted with any Blue Shield Defendant to provide services to their insureds at a discounted rate.

67.     In short, Plaintiffs and their agents learned from the Blue Shield Defendants that each Former Patient had PPO coverage for substance abuse and mental health treatments and services, and that the Blue Shield Defendants were the relevant insurance companies, administrators, and contacts for those plans.

**F.**     **After Providing Covered Services, Plaintiffs Submitted Claims for Benefits to the Blue Shield Defendants Following Blue Shield Procedures**

68.     Plaintiffs provided medically necessary substance use and behavioral health treatment services to the Former Patients that were covered by their plans or policies.

69.     Plaintiffs then sought payment by submitting the appropriate documents to the appropriate Defendants in accordance with Blue Shield's procedures. These claims for payment notified the Defendants that Plaintiffs had obtained valid Assignments from the Former Patients and asserted Plaintiffs' right to receive any benefits owed to the Former Patients under the terms of their health plans.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

14

70.     Plaintiffs are informed and believe that the insurance cards that the Defendants issued to the Former Patients instructed health providers to communicate with and submit claims directly to Blue Shield. Plaintiffs are informed and believe that the Defendants on the Provider Hotline likewise instructed Plaintiffs or their agents to submit claims to the Blue Shield for the territory in which Plaintiffs are located. Blue Shield was listed on the Insurance Verification Form.

71.     Plaintiffs complied with these procedures by submitting claims for payment directly to Blue Shield.

72.     Plaintiffs are informed and believe that the Blue Shield processes claims and finalizes and pays the claim. Blue Shield then remits payment.

73.     Plaintiffs or their agent timely submitted claims for payment to Blue Shield using industry standard UB-04 forms.

74.     UB forms are promulgated by the National Uniform Billing Committee ("NUBC"), an organization formed in 1975 "to develop and maintain a single billing form and standard data to be used nationwide by institutional, private and public providers and payers for handling health care claims."

75.     The UB-04 form includes information sufficient to allow insurance companies to identify, process, and pay claims. For example, it contains fields for the service provided, the appropriate code for that service, and the charge for the service that the provider believes is usual and customary. The UB-04 form also includes a field ("ASG BEN" in field 53) in which the provider indicates whether it has received an assignment of health care benefits from the patient.

76.     Each UB-04 form submitted in connection with services that Plaintiffs provided to each Former Patient indicated that Plaintiffs had received an assignment of health care benefits from the Former Patient.

77.     After the verification of benefits, Defendants (or their agents) repeatedly continued to interact with Plaintiffs (or their agents) with respect to the Former Patients and claims for whom Plaintiffs received assignments. In addition to verification of services, such interaction, which was over a long period of time, included receiving and processing UB-04 claim forms for payment for

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

the services, communicating with Plaintiffs (or their agents) about the services and claims, and

requesting additional documentation for the claims.

### G. The Blue Shield Defendants Approved Plaintiffs Claims but Arbitrarily Disregarded Their Assignments and/or Significantly Underpaid Claims

78.     During this continued interaction neither the Defendants nor their agents notified

Plaintiffs or their agents that Defendants would not honor any assignment of benefits. Nor did they

refuse to deal directly with Plaintiffs or their agents with respect to the claims of the Former

Patients. Indeed, Defendants (or their agents) regularly informed Plaintiffs' agents through express

words in many cases, but at a minimum impliedly through their actions, that the claims of Former

Patients at issue were freely assignable.

79.     A valid assignment obligates the debtor to pay the assignee, not the original

creditor.

80.     When there is a valid assignment in place, performance under a contract runs to the

assignee. Thus, when a creditor assigns its interest in an existing debt owed to it, the debtor must

generally pay the debt to the assignee, not the original creditor. Indeed, after a debtor has received

notice of a valid assignment, or obtained knowledge of it in any manner, assignor or any person

other than the assignee is at the debtor's peril and does not to the assignee.

81.     Plaintiffs are informed and believe that the Defendants approved and authorized

payment on Plaintiffs' claims for benefits in connection with the services provided to the Former

Patients but did not pay Plaintiffs (apparently on the grounds that Plaintiffs were assignees). In

other words, despite Defendants being informed of and provided with written notice that Plaintiffs

were assignees— and despite Defendants approving the underlying claim for covered services—

the Defendants mailed checks directly to the Former Patients and not to Plaintiffs.

82.     Plaintiffs are informed and believe that the Defendants' disregard of Plaintiffs'

Assignments is consistent with acknowledged Blue Shield's systematic practice of disregarding

the assignments of out-of-network providers like Plaintiffs.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

16

COMPLAINT

1    83.    Indeed, when Plaintiffs sought payment for covered claims the Former Patients had

2    assigned to it, Blue Shield uniformly refused to pay, or even to acknowledge, Plaintiffs' benefit

3    claims. Neither Plaintiffs' initial UB-04 requests for payment nor its follow-up letters resulted in

4    payment.

5    84.    In this litigation, the Defendants' policy of misleading Plaintiffs on the

6    assignability of claims and/or disregarding assignments to out-of- network providers like Plaintiffs

7    led them to send large sums of money to chemically dependent individuals. That practice was

8    patently reckless with respect to the health and safety of the Former Patients, as well as the health

9    and safety of the general public. It also all but guaranteed that Plaintiffs would receive only a

10   fraction of what it was owed for their services.

11   85.    In addition to disregarding the assignments of various patients, the Defendants paid

12   only a fraction of the usual and customary fees for the treatment services at issue in this litigation.

13   86.    Even considering the amounts that the Defendants may contend are the patients'

14   responsibility, the payments made by the Blue Shield Defendants are still woefully inadequate and

15   well below the usual and customary charges.  In fact, there are still hundreds of thousands of

16   dollars due and owing from the Defendants.

17   87.    In violation of their duties under California state law and, as applicable, ERISA, the

18   Defendants failed and refused to:  i) pay plaintiffs for the health care services provided to the

19   patients who are covered by various Blue Shield plans; ii) failed and refused to provide full and

20   fair review of the plaintiffs charges; and iii) failed and refused to provide a meaningful review

21   process.

22   88.    Because of the Defendants actions, Plaintiffs have been paid substantially less than

23   they should have been for the services provided.

24   89.    Attached hereto as **Exhibit A** is a chart listing all the Former Patients whose claims

25   Plaintiffs are being pursuing in this litigation. **Exhibit A** also includes, for each Former Patient,

26   the Patient's identifying initials, provider, amount billed by provider, amount paid by Defendants

27   to the Patient and the amount the provider was actually able to collect from the Patient.

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

2

3

4

5

6

7

8

9

10

11

12

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**H.    Defendants Drastically Underpaid Sovereign's Claims for Reimbursement**

90.    Sovereign treated 40 Blue Shield insureds subject to this lawsuit at Sovereign facilities and accordingly billed Defendants for the mental health and substance use treatment services provided to these insureds. Sovereign's total charges for these claims was an amount to be determined at the time of trial, reflecting the usual and customary fees for the particular services provided at Sovereign.

91.    However, to date, Defendants have reimbursed Sovereign for only a small fraction of this amount to be determined at the time of trial. Even factoring in amounts that Defendants contend are the patients' responsibility under the applicable Blue Shield plans or policies (i.e., the insured's co-payments, coinsurance, and deductibles), the total payments made by Defendants are a mere fraction of the total usual and customary charges—leaving an unpaid balance to be determined at the time of trial on these claims.

92.    Attached hereto as **Exhibit** A is a summary of the claims as issue in this lawsuit broken down by each Patient. **Exhibit A** is incorporated herein for all purposes. The summary provides the aggregate amount of charges, insurance payments and the amount Sovereign was able to collect from the patients whose claims are at issue.

**I.    Defendants Misconduct Violates Their Statutory and Regulatory Duties**

93.    California common and statutory law requires that health insurers handle submitted claims carefully, promptly, transparently and in good faith. See e.g. Cal. Health & Safety Code Sec. 1371 (providing for a 30 day time limit to either pay a claim or contest a claim and seek more information but requiring that "the notice that a claim is being contested shall identify the portion of the claim that is contested and the specific reasons for contesting the claim;" Cal Ins. Code Sec. 10123.13(a); Cal. Health & Safety Code Sec. 1363.5 ("A plan shall disclose. . . the process the plan. . . uses to authorize, modify or deny health care services under the benefits provided by the plan"); Cal Ins. Code Secs. 1023.137(a), (b); Cal. Code Reg. Sec. 1300.77.4 ("Every plan shall institute procedures whereby claim forms received by the plan from providers of health care services for reimbursement on a fee-for-fee service basis. . . are maintained and accounted for in a manner which permits the determination of the date of receipt of any claim, the status of any

1    claim, the dollar amount of unpaid claims at any time, and rapid retrieval of any claim"); 10 Cal.

2    Code Reg. Sec. 2695.3. Nor may any insurer rescind or modify its authorization for treatment

3    "after the provider renders the health care service in good faith and pursuant to the authorization."

4    Cal. Health & Safety Code Sec. 1371.8; accord Cal. Ins. Code Sec. 796.04.

5       94.     These rules (and similar rules in other states) seek to ensure that any denial or

6    partial payment of a submitted claim is based on a genuine analysis of the facts and of the

7    underlying terms of the insurance policy.

8       95.     Here, Defendants failed to follow the codes and regulations, repeatedly and

9    willfully failing to provide Plaintiffs with timely, specific, good faith explanations of their refusal

10    to fully reimburse Plaintiffs for services rendered to any Former Patient, as required by their legal

11    obligations. For each claim that Plaintiffs submitted to Defendants in connection with treating the

12    Former Patients, Defendants paid the claims at severely discounted rates without any meaningful

13    or legally permissible justification. Cf. Cal. Health & Safety Code Sec. 1371.37 (prohibiting

14    "unfair payment patterns by health insurers, where unfair payment pattern includes (1) engaging in

15    a demonstrable and unjust pattern, as defined by the department of reducing the amount of

16    payment or denying complete and accurate claims.

17       96.     By way of example and not limitation, it was not unusual for Plaintiffs to bill for

18    services that exceeded several thousand dollars to be paid by Defendants less than $100 for those

19    billed services—all without explanation or justification, as required.

20       97.     Plaintiffs seek relief for all the claims they submitted to Defendants for these

21    Former Patients.

22       **J.**     **Some Patients Pay Plaintiffs Through Blue Shield-Administered ERISA-**

23          **Governed Welfare Plans**

24       98.     Plaintiffs, who are for-profit enterprises, allow prospective patients to pay for their

25    services out-of-pocket or with health insurance. Unfortunately, many individuals in need of

26    treatment cannot afford to pay for Plaintiffs' services up front. Plaintiffs are only able to treat

27    those individuals who have health insurance covering some or all of their services.

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   99.   This litigation involves four Former Patients who paid for Plaintiffs' services

2   through health insurance provided by the Welfare Plan Defendants. Such plans and their benefits

3   are governed by ERISA.

4   100.   ERISA is a landmark federal law enacted to promote the interests of employees and

5   their beneficiaries in employee benefit plans and to protect contractually defined benefits owed to

6   those employees and beneficiaries.

7   101.   To that end, ERISA imposes extensive procedural requirements on employee

8   benefit plans. For example, it mandates that a written instrument be established and maintained, 29

9   U.S.C. § 1102; that a straightforward summary of material plan terms be furnished to participants

10   and beneficiaries, id. § 1022; that a grievance and appeals process be established, id. § 1133; and

11   that fiduciary duties be satisfied by those who manage the plan, id. § 1104.

12   102.   ERISA also gives plan participants and their beneficiaries the right to sue for

13   benefits, 29 U.S.C. § 1132(a)(1)(B), to enforce or clarify their rights under the plan, ibid., to

14   enjoin violations of ERISA or the terms of the plan, id. § 1132(a)(3)(A), and "to obtain other

15   appropriate equitable relief . . ." id. § 1132(a)(3)(B).

16   103.   Each of the plans offered by Welfare Plan Defendants covered the mental health

17   and/or substance abuse treatment services provided by Plaintiffs to the Former Patients. As

18   explained below, before agreeing to provide treatment, Plaintiffs' general practice is to contact a

19   patient's insurer to confirm that the treatment they offer is covered, and that the assigned benefits

20   claims brought here arise from services provided to Former Patients for which Plaintiffs received

21   such a coverage confirmation.

22   104.   ERISA distinguishes between self-insured and fully insured employee benefit

23   plans. In self-insured plans, the employer pays directly for the covered health care services

24   provided to participants and beneficiaries. In fully insured plans, the employer buys group health

25   insurance coverage and the insurance company pays for covered health care services.

26   105.   The Welfare Plan Defendants include both self-insured and fully insured employee

27   benefit plans. Plaintiffs are informed and believe that:

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

20

COMPLAINT

1   a)  Each fully insured Welfare Plan Defendant bought group health insurance coverage

2 from a Blue Shield Defendant and retained a Blue Shield Defendant as a third-party administrator

3 ("TPA"); and

4   b)  Each self-insured Welfare Plan Defendant retained a Blue Shield Defendant as a

5 TPA.

6   106. Plaintiffs are informed and believe that, either as group insurers or group TPAs, the

7 Blue Shield Defendants provided extensive services to the Welfare Plan Defendants pursuant to

8 administrative service agreements ("ASAs") between the parties. These services included:

9 determining to whom and in what amounts benefits are paid, drafting and providing plan members

10 with ERISA plan documents, interpreting plan documents, providing notices to employees and

11 their beneficiaries, determining usual and customary rates, and/or hearing and deciding

12 administrative appeals.

13   107. Plaintiffs are informed and believe that as insurers or TPAs, the Blue Shield

14 Defendants "effectively controlled the decision whether to honor or deny a claim" on behalf of the

15 Welfare Plan Defendants. Cyr v. Reliance Life Ins. Co., 642 F.3d 1202, 1204 (9th Cir. 2011).

16 Indeed, Plaintiffs are informed and believe that the Welfare Plan Defendants had little if any

17 involvement in claims administration or pricing and deferred entirely to the Blue Shield

18 Defendants.

19   108. Because the Blue Shield Defendants, as either insurers or TPAs, exercised

20 discretion in connection with the granting or denial of benefits and otherwise with respect to plan

21 administration, they are fiduciaries under ERISA.

22   109. Plaintiffs are informed and believe that the Blue Shield Defendants that served as

23 TPAs, were, because of terms of the ASAs or otherwise, motivated by financial incentives to keep

24 benefit costs to the self-insured Welfare Plan Defendants. The Blue Shield Defendants who

25 insured the Welfare Plan Defendants had independent financial incentives to keep benefit costs

26 low because they paid for covered health care services themselves.

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

2

3

4

5

6

7

8

9

10

11

12

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

### (Against Blue Shield Defendants)

109.    Plaintiffs repeat the allegations contained in each of the preceding paragraphs of this Complaint.

110.    Under California law, a cause of action for breach of contract requires "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages. The breach of contract law in other states is in accord.

111.    Plaintiffs treated numerous patients, including those listed on the attached **Exhibit A.**

112.    After confirming with defendants that these approximately 40 patients were covered under defendants' policies, plaintiffs obtained an assignment from each Former Patient.

113.    As assignees of the claims of these approximately 40 patients, plaintiffs are entitled to reimbursement for the services rendered based on the existence and terms of the insurance policies that covered these 40 patients.

114.    In the alternative, Plaintiffs are express and intended beneficiaries of the subject insurance contracts and are entitled to recover on that basis as well. "For purposes of determining whether a third party is an intended beneficiary, the relevant intent is that of the promise, and it is sufficient if the promisor understood that the promise had the intent." *Serv. Emps. Int'l Union, Local 99 v. Options – A Child Care & Human Servs. Agency*, 200 Cal. App. 4th 869, 879 (2011).

115.    Individuals pay more for PPO plans precisely so they can seek treatment from out-of-network providers and for the certainty that their insurer will reimburse that provider for the treatment. The terms of these 40 Former Patients' policies reflect that bargain and the intent that out-of-network providers, like the Plaintiffs will be paid by Defendants for rendering services.

116.    As alleged above, before rendering services, Plaintiffs confirmed that each of these 40 Former Patients was covered by a policy issued by Defendants. At great cost to themselves, Plaintiffs then rendered medically necessary substance abuse and/or mental health treatment services and toxicology testing services to the 40 Former Patients.

117.    After rendering those services, Plaintiffs submitted the appropriate claims forms to Defendants or their agents, seeking compensation for the care and treatment they provided to these 40 Patients.

118.    Plaintiffs did not receive full or reasonable – or in some cases any – compensation for the services they provided; indeed, on numerous occasions Defendants paid only pennies on the dollar for the Plaintiffs services.

119.    Plaintiffs are informed and believe that there are no legally operative terms within the policies governing the 40 Former Patients that entitled Defendants to deny Plaintiffs the full and/or reasonable compensation for the services they rendered to the 40 Former Patients in good faith.  Plaintiffs duly performed covered services under the various insurance contracts and are entitled to be paid.

120.    Defendants are also equitably estopped from denying coverage and/or asserting any newly minted defense to payment that were not set forth, in writing, at the appropriate time int eh claims process. See e.g., *City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 488 (2008) ("In the insurance context especially, estoppel may arise from a variety of circumstances in which the insurer's conduct threatens to unfairly impose a forfeiture of benefits upon the insured.") Equitable estoppel occurs when "(1) the party to be estopped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the other party to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage he has thus inflicted upon the second party" Id.[3]

121.    Defendants repeatedly and willfully violated the relevant claims handling obligations imposed by the laws identified above, by failing to provide Plaintiffs with timely, specific, good faith explanations of their refusal to fully reimburse Plaintiffs for services rendered to the 40 Former Patients.  Those regulatory violations provide a well-recognized basis for estoppel, particularly in the insurance context. See e.g. *Zembsch v. Superior Court*, 146 Cal. App.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

---

[3] Although equitable estoppel is not an independent cause of action under California law, it can be pleaded "as a part of the cause of action." *Moncada v. W. Coast Quarts Corp.*, 221 Cal. App. 4th 768, 782 (2013).

1    4th 153, 168 (2006) (holding that a violation of the Knox-Keene Act "renders an arbitration

2    agreement unenforceable"); *Spray, Gould & Bowers v. Assoc. Int'l Ins. Co.*, 71 Cal. App. 4th

3    1260, 1268-74 (1999).

4        122.    Defendants also waived any new defenses by not asserting them at the appropriate

5    times.

6        123.    Defendants are in breach of the relevant insurance policies and have damaged

7    Plaintiffs by refusing to pay the amounts required under those insurance policies.

8        124.    Plaintiffs are entitled to compensatory damages equal to the value of their services

9    plus interest and costs.

10

11                         **SECOND CLAIM FOR RELIEF**

12                          **PROMISSORY ESTOPPEL**

13                         **(Against Blue Shield Defendants)**

14        125.    Plaintiffs repeat the allegations contained in each of the preceding paragraphs of

15    this Complaint.

16        126.    Promissory Estoppel is an equitable doctrine whereby "a promise which the

17    promisor should reasonably expect to induce action or forbearance on the part of the promise or a

18    third person and which does induce such action or forbearance is binding if injustice can be

19    avoided only be enforcement of the promise." *Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp.*

20    *Auth.*, 23 Cal. App. 4th 305, 310 (2000). The elements are: (1) a promise, (2) the reasonable

21    expectation by the promisor that the promise will induce reliance or forbearances, (3) actual

22    reliance or forbearance, and (f) avoidance of injustice by enforcing the promise. *Fleet v. Bank of*

23    *Am. 22 N.A.*, 229 Cal. App. 4th 1403, 1412 (2014).

24        127.    The facts here readily satisfy those elements. The series of communications

25    between Plaintiffs and Defendants evinced a clear promise that Defendants would pay Plaintiffs

26    for Plaintiffs expert treatment of the Former Patients, and in reliance on Defendants'

27    representations, Plaintiffs expended substantial resources providing treatment.

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

                                          24

128.     Further, Plaintiffs' reliance on Defendants' representation was not merely foreseeable, it was precisely what Defendants hoped would happen as part of their unlawful scheme. Plaintiffs' reliance on Defendants affirming pattern of conduct was also eminently reasonable, especially in light of industry custom and the parties' past interactions. Providers like Plaintiffs routinely contact Defendants to verify that prospective patients have coverage for their services and that Defendants agree that the patients require those services. Providers then react to positive confirmation by providing the covered medically necessary treatment.

129.     The parties conduct must also be viewed against the backdrop of the comprehensive regulatory scheme. As discussed, insurers must handle claims in good faith and cannot impermissibly modify or rescind authorizations. As repeat players in this industry, Defendants knew that Plaintiffs would interpret their communications regarding insurance coverage and authorizations considering the regulations that circumscribe Defendants conduct and Plaintiffs reasonably believed that Defendants would act in accordance with the law. Defendants' subsequent failure to abide by their statutory and regulatory duties support the imposition of promissory estoppel.

## THIRD CLAIM FOR RELIEF
## UNFAIR BUSINESS PRACTICES
### (Against Blue Shield Defendants)

130.     Plaintiffs repeat the allegations contained in each of the preceding paragraphs of this Complaint.

131.     California's Unfair Competition Law ("UCL"), Bus. Prof. Code Sec. 17200 *et seq.*, prohibits unlawful, unfair, and fraudulent business practices. Defendants' conduct violates all three of these prongs.

132.     Defendants unfair and fraudulent scheme was clear. They intended to sell the subject policies and pocket the premiums, sit back as their insureds sought medically necessary behavioral health treatment, confirm to Plaintiffs that the subject patient-insureds were covered, and then, on unspecified and/or technical grounds and in direct contravention of their prior

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1  statements to Plaintiffs, and their statutory and regulatory duties, refuse to fully compensate

2  Plaintiffs for the services that were rendered to, and benefitted Defendants' patient-insureds.

3      133.    Defendants were and are enriched by keeping premiums without having to pay for

4  care. Defendants further benefited by satisfying their customers, as the Former Patients received

5  the needed care. Defendants' practices were unfair and deceptive to Plaintiffs (as those practices

6  would be to any reasonable consumer), who were induced by Defendants misleading statements to

7  treat the Former Patients and misled into believing that they would be paid fairly for rendering

8  those expert services. *Cf. Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254

9  (2009) ("A fraudulent business practice is one in which members of the public are likely to be

10  deceived").

11      134.    The harm caused by Defendants is substantial and is not outweighed by any

12  countervailing benefits to consumers or society. To the contrary, as discussed, Defendants conduct

13  severely impacts vulnerable members of society and the healthcare providers attempting to remedy

14  the scourge of substance abuse and addiction.

15      135.    The unfairness of Defendants conduct is underscored by its effect on policyholders

16  and patients, who were also fraudulently misled into believing that under Defendants' policies

17  they could choose, and Defendants would pay for, care supplied by providers such as Plaintiffs,

18  when in fact Defendants intended to illegally underpay treatment centers throughout California.

19  The policies Defendants sold were worth far less than what a reasonable person buying the policy

20  would have believed. And these individuals are some of the most vulnerable in society, with few

21  options available for treatment of their disease.

22      136.    Defendants' practices are also unlawful in that they violate the Mental Health

23  Parity and Addiction Equity Act of 2008 ("MHPAEA"). The MHPAEA is an antidiscrimination

24  statute intended to ensure that coverage of mental health and substance abuse care (such as that

25  which Plaintiffs provide) is in "parity" with coverage of medical and surgical care.

26      137.    The MHPAEA and its implementing regulations make clear that any "financial

27  requirements" or "treatment limitations" an insurer applies to mental health or substance abuse

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1  policy benefits must be no more restrictive than the financial requirements or treatment limitations

2  applied to medical and surgical policy benefits.

3      138. Treatment limitations can be "quantitative" or "non-quantitative." Quantitative

4  treatment limitations are expressed numerically (e.g., frequency of treatment, number of visits,

5  days of coverage, days in a waiting period); non-quantitative treatment limitations limit the scope

6  or duration of benefits for treatment.

7      139. Absent a clinically appropriate justification, an insurer may not impose a

8  nonquantitative treatment limitation on mental health or substance abuse benefits unless, under the

9  terms of the plan as written and in operation, the factors used in applying the non-quantitative

10  treatment limitation to mental health or substance use disorder benefits are comparable to, and are

11  applied no more stringently than, the factors used in applying the limitation with respect to

12  medical/surgical benefits in the same classification.

13      140. The relevant regulations make clear that reimbursement behavior, including

14  without limitation the rates and the methods for determining usual, customary, and reasonable

15  charges, are non-quantitative limitations governed by MHPAEA.

16      141. Upon information and belief, Defendants treated Plaintiffs (and providers of

17  substance abuse treatment like Plaintiffs) differently than providers offering medical and surgical

18  services. Defendants have brazenly disregarded claims regulations and underpaid or delayed

19  paying claims based on the application of standards and conditions that Plaintiffs are informed and

20  believe do not apply to medical and surgical claims.

21      142. As a remedy for their unlawful, unfair, and fraudulent practices, Defendants should

22  be ordered to pay restitution, and for all claims Plaintiffs may present in the future, as well as for

23  any pending claims, to the degree such relief is appropriate, Defendants should also be ordered to:

24  inform Plaintiffs, promptly and in writing, whether the claim is approved, partially approved, or

25  denied; inform Plaintiffs, promptly and in writing, of the particular contractual provision upon

26  which any denial or partial denial of a claim is based; inform Plaintiffs of the mathematical basis

27  upon which it has calculated the amount it has proposed to reimburse Plaintiffs, if that

28  reimbursement is less than 100% of the submitted charge; promptly provide Plaintiffs with a

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   complete copy of the operative policy from which any provision has been cited as justification for

2   the denial, in whole or in part, of a submitted claim; and otherwise strictly follow all governing

3   state law concerning the handling of claims.

4

5                                   **FOURTH CLAIM FOR RELIEF**

6                                  **BAD FAITH INSURANCE DENIAL**

7                                    **(Against Blue Shield Defendants)**

8        143.    Plaintiffs repeat the allegations contained in each of the preceding paragraphs of

9   this Complaint.

10       144.    "[T]he law implies in every contract a covenant of good faith and fair dealing,"

11  which "requires each contracting party to refrain from doing anything to injure the right of the

12  other to receive the benefits of the agreement." Egan v. Mut. of Omaha Ins. Co., 24 Cal. 3d 809,

13  818 (1979).

14       145.    Plaintiffs, by assignment or operation of law, stand in the shoes of these 40 Former

15  Patients, who were all insured under a policy of insurance issued by Defendants.

16       146.    For each of the 40 Former Patients, Plaintiff asserted a valid claim for the payment

17  of benefits covered by the subject insurance policy under which a particular Former Patient was

18  treated.

19       147.    Defendants failed to deal fairly and in good faith with Plaintiffs with respect to

20  these 40 Former Patients by unreasonably failing to investigate the claims, by unreasonably failing

21  to pay the claims, by unreasonably failing to pay the claims in full, or by unreasonably paying the

22  claims for a significantly reduced and unjustified rate.

23       148.    Defendants' failure to deal fairly and in good faith caused Plaintiffs to suffer

24  damages.

25       149.    Defendants' bad faith was a deliberate part of a larger scheme to not pay providers,

26  like Plaintiffs, who treat recovering drug addicts.

27       150.    Plaintiffs are entitled to compensatory damages as allowed by law.

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

## FIFTH CLAIM FOR RELIEF

### CLAIM TO RECOVER BENEFITS UNDER ERISA

**(Against Welfare and Blue Shield Defendants Associated With**

**Plans Lacking Applicable Anti-Assignment Provisions)**

151.    Plaintiffs repeat the allegations contained in each of the preceding paragraphs of this Complaint.

152.    Four of the Former Patients had health insurance provided by an employer-sponsored plan or other plan covered by ERISA.

153.    ERISA is a landmark federal law enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits owed to those employees and beneficiaries.

154.    To that end, ERISA imposes extensive procedural requirements on employee benefit plans. For example, it mandates that a written instrument be established and maintained, 29 U.S.C. § 1102; that a straightforward summary of material plan terms be furnished to participants and beneficiaries, id. § 1022; that a grievance and appeals process be established, id. § 1133; and that fiduciary duties be satisfied by those who manage the plan, id. § 1104.

155.    ERISA also gives plan participants and their beneficiaries the right to sue for benefits, 29 U.S.C. § 1132(a)(1)(B), to enforce or clarify their rights under the plan, ibid., to enjoin violations of ERISA or the terms of the plan, id. § 1132(a)(3)(A), and "to obtain other appropriate equitable relief . . ." id. § 1132(a)(3)(B).

156.    Each of the plans of the four Former Patients covered the mental health and/or substance abuse treatment services provided by Plaintiffs to the Former Patients. As explained above, before agreeing to provide treatment, Plaintiffs' general practice was to contact a patient's insurer to confirm that the treatment they offer was covered, and that the assigned benefits claims brought here arose from services provided to Former Patients for which Plaintiffs received such a coverage confirmation.

157.    Plaintiffs are informed and believe that, either as group insurers or group third party administrators, the Blue Shield Defendants provided extensive services to the plans pursuant

29

1    to administrative service agreements ("ASAs") between the parties. These services included:

2    determining to whom and in what amounts benefits are paid, drafting and providing plan members

3    with ERISA plan documents, interpreting plan documents, providing notices to employees and

4    their beneficiaries, determining usual and customary rates, and/or hearing and deciding

5    administrative appeals.

6        158.    Plaintiffs are informed and believe that, as insurers or TPAs, the Blue Shield

7    Defendants "effectively controlled the decision whether to honor or deny a claim" on behalf of the

8    plans. Indeed, Plaintiffs are informed and believe that the various employer plans had little if any

9    involvement in claims administration or pricing and deferred entirely to the Blue Shield

10   Defendants.

11       159.    Because the Blue Shield Defendants, as either insurers or TPAs, exercised

12   discretion in connection with the granting or denial of benefits and otherwise with respect to plan

13   administration, they are fiduciaries under ERISA.

14       160.    The Blue Shield Defendants who insured the various plans had independent

15   financial incentives to keep benefit costs low because they paid for covered health care services

16   themselves.

17       161.    Plaintiffs are "beneficiaries" under ERISA with standing to assert the claims of

18   their assignors. See *Misic v. Bldg. Servs. Emps. Health & Welfare Trust*, 789 F.2d 1374, 1379 (9th

19   Cir. 1986). And any beneficiary—including an assignee—who makes a claim is a "claimant"

20   under federal law. 29 C.F.R. § 2560.503-1(a) ("[T]his section sets forth minimum requirements

21   for employee benefit plan procedures pertaining to claims for benefits by participants and

22   beneficiaries (hereinafter referred to as claimants).")

23       162.    Plaintiffs formally asserted claims for ERISA benefits to ERISA fiduciaries by

24   submitting UB-04s to the Blue Shield Defendants for services provided to the Former Patients.

25       163.    Plaintiffs never received any response from the Blue Shield Defendants. As

26   Plaintiffs learned only later and at great expense, the Blue Shield Defendants instead had approved

27   and authorized payment on the claims for Plaintiffs' services to the Former Patients. The Blue

28   Shield Defendants then issued payment checks to the Former Patients.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

30

COMPLAINT

1    164.    When the Blue Shield Defendants instead sent claims payment checks to the

2    Former Patients, Plaintiffs received no written notice that payment had been made. As a result,

3    Plaintiffs did not know whether the Blue Shield Defendants had acted on their claims at all, what

4    decisions they had reached if they had, or why they never received payment.

5    165.    Only recently, after a costly and protracted investigation, were Plaintiffs able to

6    ascertain, based on the currently available information, the amounts that are owed with respect to

7    some of the Former Patients.

8    166.    Plaintiffs were unable to challenge any of the payments made to the Former

9    Patients because they were not given notice of the payments and were not given copies of the

10    Explanation of Benefits. Even now, despite repeated requests, Plaintiffs do not have the operative

11    plan documents for most if not all the Former Patients. In addition, for the several Former Patients,

12    the applicable Blue Shield Defendant have not explained the method by which it calculated the

13    amount paid, as required by 29 C.F.R. § 2560.503-1.

14    167.    Defendants have violated ERISA laws and regulations and the terms on the

15    applicable plans in the following ways:

16    a)    Failing to honor Plaintiffs' valid Assignments of Benefits and, instead, making

17    payment directly to Former Patients;

18    b)    Failing to promptly notify Plaintiffs or Former Patients if additional information

19    was needed to honor a valid Assignment of Benefits;

20    c)    Failing to promptly notify Plaintiffs or Former Patients that a valid Assignment of

21    Benefits would not be honored;

22    d)    Failing to produce plan documents;

23    e)    Failing to provide explanation of benefits;

24    f)    Failing to properly interpret plan language so as to properly pay plan benefits; and

25    g)    Failing to properly explain the calculation of the payment of benefits.

26    h)    Paying substantially less than usual and customary amounts for the services

27    provided to the patients.

28    168.    As a result, Plaintiffs have been damaged in the following ways, among others:

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1      a)     Plaintiffs were not paid in accordance with valid Assignments of Benefits;

2      b)     Plaintiffs had to recover payments from Former Patients, at their own expense;

3      c)     Plaintiffs have been unable to recover all payments from all Former Patients;

4      d)     Plaintiffs have been unable to participate in the administrative appeal process as

5  they were not given proper notice;

6      e)     Plaintiffs have been unable to ascertain whether payments to some Former Patients

7  were proper, as they do not have plan documents, explanation of benefits, and/or explanations of

8  the calculation of the payment of benefits; and

9      f)     Plaintiffs, in pursuing this action, has been required to incur attorneys' costs and

10  fees. Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiffs are entitled to have such fees and costs paid by

11  Defendants.

12

13                           **PRAYER FOR RELIEF**

14      **WHEREFORE**, Plaintiffs pray for judgment against the Defendants, and that the Court

15  award the following relief:

16      1)     A judgment declaring Defendants conduct unlawful;

17      2)     An award of equitable relief as necessary to stop Defendant's pattern of unlawful,

18  unfair and deceptive conduct;

19      3)     Award damages, in an amount to be proven at trial, plus all applicable interest and

20  costs;

21      4)     Award all attorney's fees and costs incurred in bringing this action, to the extent

22  recoverable by law; and

23      5)     Issue all other relief the Court deems appropriate, proper, and just.

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiffs demand a jury trial for all claims so triable.

3

4     Dated: December 8, 2021                    **KANTOR & KANTOR, LLP**

5
                                        By:     /s/ *Timothy J. Rozelle*
6                                               Lisa S. Kantor
                                                Timothy J. Rozelle
7                                               Attorneys for Plaintiffs
                                                Dual Diagnosis Treatment Center, Inc. d/b/a
8                                               Sovereign Health of California ("Dual
                                                Diagnosis"); Shreya Health of California, Inc.
9                                               ("Shreya"); Medical Concierge, Inc. d/b/a
                                                Medlink ("Medlink"); Satya Health of
10                                              California, Inc. ("Satya"); Sovereign Health
                                                of Phoenix, Inc.; Shreya Health of Arizona,
11                                              Inc.; and Vedanta Laboratories, Inc.
                                                ("Vedanta")
12

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33

# EXHIBIT A

EXHIBIT A

| | Patient Name | Patient ID # | Provider | Amount Billed | Amount Paid to Patient | Collected from Patient |
|---|---|---|---|---|---|---|
| 1. | Al.Yo | | Shreya | $1,450 | $290.08 | $0.00 |
| 2. | An.Sa. | | Medical Concierge; Shreya of CA. | $7,565.00 | $475.00 | $0.00 |
| 3. | An. Ka. | | Sov. Health of Phx.; Vedanta Labs; Shreya of AZ. | $171,988.00 | $11,029.66 | $0.00 |
| 4. | Az.St. | | Vedanta Labs | $14,648.00 | $252.80 | $0.00 |
| 5. | Br.Ha. | | Vedanta Labs | $3,662.00 | $62.95 | $0.00 |
| 6. | Br.Cl. | | Vedanta Labs; Shreya of CA; Satya of CA | $36,450.00 | $1,485.00 | $330.00 |
| 7. | Cy.Fr. | | Shreya | $1,600.00 | $178.38 | $90.18 |
| 8. | Da.Pa. | | Sovereign of CA | $9,105.00 | $1,692.00 | $0.00 |
| 9. | Da.Un. | | Vedanta Labs | $40,282.00 | $692.45 | $0.00 |
| 10. | El.Co. | | Vedanta Labs; Shreya of CA | $53,144.00 | $457.70 | $514.77 |
| 11. | Er.Cr. | | Vedanta Labs; Medical Concierge | $64,104.00 | $2,858.90 | $0.00 |
| 12. | Ga.Gu. | | Vedanta Labs | $7,324.00 | $125.90 | $0.00 |
| 13. | Gi.As. | | Sov. Health of Phx; Shreya of AZ; Sov. Health of AZ | $93,650.00 | $5,864.90 | $0.00 |
| 14. | Go.Du. | | Vedanta Labs | $7,324.00 | $125.90 | $0.00 |
| 15. | He.Fe. | | Vedanta Labs; Medical Concierge | $41,482.00 | $3,604.89 | $0.00 |
| 16. | Is.Fu. | | Vedanta Labs; Shreya of CA | $4,142.00 | $106.50 | $0.00 |

1

EXHIBIT A

| | Patient Name | Patient ID # | Provider | Amount Billed | Amount Paid to Patient | Collected from Patient |
|---|---|---|---|---|---|---|
| 17. | Ja.Di. | | Vedanta Labs; Medical Concierge; Shreya of CA | $120,511.00 | 9,626.92 | $0.00 |
| 18. | Ja.Bl. | | Shreya of CA | $7,324.00 | $125.90 | $0.00 |
| 19. | Je.Fe. | | Vedanta Labs | $32,958.00 | $595.58 | $0.00 |
| 20. | Je.Hi. | | Vedanta Labs | $3,662.00 | $125.91 | $0.00 |
| 21. | Jo.Er. | | Vedanta Labs | $25,634.00 | $440.65 | $0.00 |
| 22. | Jo.He. | | Vedanta Labs | $3,005.00 | $48.56 | $0.00 |
| 23. | Jo.Co. | | Vedanta Labs | $3,662.00 | $62.95 | $0.00 |
| 24. | Ka.So. | | Adeona Healthcare; Shreya Health of CA | $4,175.00 | $317.57 | $0.00 |
| 25. | Ke.Pe. | | Medical Concierge | $1,200.00 | $500.00 | $0.00 |
| 26. | Kh.Du. | | Shreya Health of CA | $625.00 | $625.00 | $0.00 |
| 27. | La.Ha. | | Vedanta Labs | $14,648.00 | $251.80 | $0.00 |
| 28. | Le.La. | | Medical Concierge | $1,200.00 | $282.00 | $0.00 |
| 29. | Ma.Be. | | Sovereign Health of CA; Shreya Health of CA; Vedanta Labs | $8,782.00 | $2,206.50 | $0.00 |
| 30. | Ma.Pa | | Satya Health of CA | $29,550.00 | $2,310.00 | $0.00 |
| 31. | Mi.Wi. | | Vedanta Labs | $3,662.00 | $62.95 | $0.00 |
| 32. | Ni. Oc. | | Vedanta Labs | $32,958.00 | $755.46 | $0.00 |
| 33. | Ni.Ro. | | Sovereign Health of Phoenix | $9,105.00 | $405.00 | $0.00 |

2

EXHIBIT A

| | Patient Name | Patient ID # | Provider | Amount Billed | Amount Paid to Patient | Collected from Patient |
|---|---|---|---|---|---|---|
| 34. | Pe.En. | | Vedanta Labs | $3,662.00 | $10.26 | $0.00 |
| 35. | Qu.Be. | | Shreya Health of CA | $1,025.00 | $138.34 | $0.00 |
| 36. | Ro.Fi. | | Vedanta Labs Sovereign | $18,187.00 | $1,160.07 | $0.00 |
| 37. | Ro.Ra. | | Satya Health of CA; Vedanta Labs | $26,040.00 | $646.60 | $0.00 |
| 38. | Sa.Wi. | | Satya Health of CA, Shreya Health of CA, Vedanta Labs | $83,610.00 | $6,461.81 | $0.00 |
| 39. | Te.Ar. | | Sovereign Health of Phoenix | $112,015.00 | $3,589.79 | $0.00 |
| 40. | Zo.Da. | | Vedanta Labs | $9,295.00 | $141.39 | $0.00 |
| | | | **Totals:** | **$1,114,415.00** | **$60,194.02** | **$934.95** |

3